JUDGE BUCHWALD

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

FXI, INC.,

                      Plaintiff,

        v.

ILLINOIS UNION INSURANCE COMPANY,

                      Defendant.

**15 CV 2885**

:  Civil Action No.
:
:
:
:
:
:
:
:
:
:



**COMPLAINT**

Plaintiff FXI, Inc. ("FXI"), by way of its Complaint against Defendant Illinois Union Insurance Company ("Illinois Union"), hereby alleges and states as follows:

**NATURE OF THIS ACTION**

1.    This is a civil action for breach of contract under a pollution liability insurance policy issued to FXI by Illinois Union. FXI brings this action to redress Illinois Union's breach of its contractual obligations under the insurance policy.

2.    In breach of its contractual obligations, Illinois Union has failed and refused to pay up to approximately $1.4 million in costs incurred and to be incurred by FXI for the remediation of volatile organic compounds located in the groundwater, soil, soil vapor, and sub-slab vapor at an industrial site located at 18801 Old Statesville Road, Cornelius, Mecklenburg County, North Carolina. FXI is obligated to perform the remediation efforts pursuant to the law of the state of North Carolina and a Registered Environmental Consultant Administrative Agreement for the Site ("Administrative Agreement"), entered into between FXI and the North Carolina Department of Environment and Natural Resources ("NCDENR").

## PARTIES

3.      Plaintiff FXI, Inc. ("FXI") is a corporation organized under the laws of Delaware with its principal place of business at 1400 N. Providence Rd., Suite 2000, Media, Pennsylvania, 19063-2081.

4.      Defendant Illinois Union Insurance Company ("Illinois Union") is a corporation organized under the laws of Illinois with its principal place of business at 525 W. Monroe St., Suite 400, Chicago, Illinois, 60661-3639.

## JURISDICTION AND VENUE

5.      This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and the amount in controversy exceeding $75,000.

6.      The relief requested in this Complaint is also proper under 28 U.S.C. § 2201, in that this is "a case of actual controversy within" this Court's jurisdiction, allowing it to "declare the rights and other legal relations of any interested party seeking such declaration."

7.      This Court also has *in personam jurisdiction* over Defendant because Defendant does business in New York.

8.      Upon information and belief, venue is proper pursuant to 28 U.S.C. § 1391(b) as the Policy was underwritten in the Southern District of New York.

## FACTUAL BACKGROUND

### FXI's Business, Relevant Site History, and the Administrative Agreement

9.      FXI is a leading producer of foam products for the home, healthcare, electronics, industrial, personal care, and transportation markets.

10.     FXI owns and operates multiple properties, including an industrial site at 18801 Old Statesville Road, Cornelius, Mecklenburg County, North Carolina (the "Site").  The Site operates an active manufacturing facility.  It consists of approximately 50.83 acres, and contains warehouse facilities, a facility maintenance shop, and a hazardous waste storage building.

11.     Foamex L.P. ("Foamex") commenced ownership of the Site on October 2, 1990. On June 12, 2009, FXI and affiliates acquired substantially all of the assets of Foamex L.P. and its affiliates, including the Site, in a Bankruptcy Court-approved sale pursuant to Section 363(f) of the Bankruptcy Code.

12.     On August 31, 1992, a methylene chloride spill occurred at the Site near the above ground storage tank ("AST") building.

13.     Foamex immediately undertook efforts to assess the soil and groundwater at the Site to define the horizontal and vertical extent of the contamination.   The results of investigations conducted between 1993 and 1995 indicated the presence of certain volatile organic compounds ("VOCs") of concern in the soil and groundwater samples near the AST building, which exceeded North Carolina quality standards.

14.     In April 1996, Foamex installed a combination air sparging and soil vapor extraction ("AS/SVE") system for the remediation of the on-site soils and groundwater.

15.     In December 2002, the AS/SVE system was shut down in an effort to determine if the VOCs within the impacted area could be remediated through natural attenuation.

16.     Assessment activities were conducted and indicated that the total VOCs in monitoring wells ("MWs") at the location of the methylene chloride release (i.e., MW-2S, MW-3S, MW-4S, MW-5S, MW-5i, MW-6S, MW-7S, MW-7D, and MW-8S), had been significantly reduced between August 2002 and February 2003 (by approximately 86%).

17.     Remediation by natural attenuation was recommended and annual groundwater monitoring continued from 2003 through 2009.

18.     In November 2008, Foamex received a letter from the NCDENR regarding its obligations for, *inter alia*, future assessment and cleanup activities at the Site.  The letter noted that the assessment and cleanup activities could be conducted through the NCDENR's Voluntary Cleanup Program or pursuant to an Order issued under N.C. Gen. Stat. § 130A-310.3.  The letter warned that "if you choose not to conduct a cleanup through the Voluntary Cleanup Program, the site may be referred to the United States Environmental Protection Agency ('EPA').  If so referred, EPA will screen the site for Federal enforcement action under the Federal Superfund Program, established under the Comprehensive Environmental Responsibility, Compensation, and Liability Act ('CERCLA')."

19.     In August 2009, FXI received a letter from the NCDENR noting, in relevant part, that "a unilateral Order may be issued pursuant to § 130A-310.3 to compel assessment and cleanup" and that, if FXI chose not to conduct a cleanup voluntarily, the Site could be referred to the EPA, which would screen the Site for a federal enforcement action.

20.     Subsequently, on April 8, 2010, FXI entered into an Administrative Agreement with the NCDENR to conduct remedial action at the Site.

**The Policy**

21.     Illinois Union sold a "Global Premises Pollution Liability Insurance Policy" to Foamex Innovations, Inc., policy number PPL G24879665 001, with a policy period from June 12, 2009 to June 12, 2014 (the "Policy").  A true and correct copy of the Policy is attached hereto as Exhibit A.

22.     FXI is a named insured under the Policy pursuant to Endorsement 8, and by virtue of the legal name change of "Foamex Innovations Operating Company" to "FXI, Inc." *See* Policy, End. 8.

23.     The Policy is a claims-made policy. *See id.*

24.     The limits of liability of the Policy are $5,000,000 per pollution condition and $10,000,000 in the aggregate. *Id.*, Decls.

25.     The Policy has a retention of $100,000 per pollution condition. *Id.*

26.     FXI satisfied the retention amount by payments made to remediate the "pollution conditions" pursuant to the Administrative Agreement.

27.     Pursuant to Coverage A of the Policy, as amended by Endorsement 16, Illinois Union agreed to pay FXI for:

> "Claims" and associated "legal defense expenses" in excess of the "self-insured retention", arising out of a "pollution condition" on, at, under or migrating from a "covered location", provided the "claim" is first made during the "policy period". Any such "claim" must also be reported to the Insurer, in writing, during the "policy period" or any applicable "extended reporting period."
>
> The coverage afforded under this Coverage **A.** only applies to "pollution conditions" that first commence, in their entirety, on or after the inception date identified in Item **2.a.** of the Declarations to this Policy.

*Id.* § I.A, End. 16.

28.     The Policy defines "Claim," in relevant part, as "the written assertion of a legal right received by the 'insured' from a third-party, including but not limited to a 'governmental action', suits or other actions alleging responsibility or liability on the part of the 'insured' for 'bodily injury', 'property damage', or 'remediation costs' arising out of 'pollution conditions' to which this insurance applies." *Id.* § V.D.

29.     The Policy defines "Remediation costs" as, *inter alia*, the "reasonable expenses incurred to investigate, quantify, monitor, mitigate, abate, remove, dispose, treat, neutralize or immobilize 'pollution conditions' to the extent required by 'environmental law.'" *Id.* § V.BB.

30.     The Policy, as amended by Endorsement 6, defines "Pollution condition" as

> the discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including smoke, soot, vapors, fumes, acids, alkalis, chemicals, hazardous substances, hazardous materials, or waste materials, on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater. For the purpose of this definition, waste materials includes, but is not limited to "low-level radioactive waste" and "mixed waste".

*Id.*, End. 6.

31.     The Site is a "covered location" under the Policy. *Id.*, End. 15

32.     Pursuant to Endorsement 15 of the Policy, the retroactive date for Coverage A at the Site is October 2, 1990. *Id.*

33.     Pursuant to Endorsements 7 and 17 to the Policy, the parties agreed that certain identified "pollution conditions" constitute "Known Conditions." *See id.*, Ends. 7, 17. "Remediation costs" for the "Known Conditions" identified in Endorsement 7 and 17 are excluded from coverage pursuant to Endorsement 14 of the Policy. *See id.*, End. 14.

**The "Pollution Conditions" at the Site**

34.     The "pollution conditions" at the Site for which FXI seeks coverage are previously unknown migrations of certain VOCs, which exceed North Carolina quality standards.

35.     The VOCs were detected during investigations of the groundwater, soil, soil vapor, and sub-slab vapor at the Site, which were conducted from 2012 – 2015 by FXI's

registered environmental consultant ("REC"), pursuant to the Administrative Agreement between FXI and the NCDENR.

36.     While investigation activities conducted through March 2013 were initially focused in the area of the 1992 methylene chloride discharge, investigations were conducted below the plant building's floor in late 2013 and early 2014—and then later expanded—when the REC discovered a former floor drain system inside the plant building.

37.     The results of the investigations have identified two source areas of contamination at the Site: (1) the area of the 1992 methylene chloride release; and (2) the area of the former floor drain system in the plant.

38.     The release associated with the former floor drain system in the plant was not identified during previous investigations.

39.     With respect to the groundwater at the Site, investigations show the presence of several compounds above acceptable concentrations: tetrachloroethene ("PCE"); trichloroethene ("TCE"); cis-1,2-dichloroethene ("cis-1,2-DCE"); vinyl chloride ("VC"); 1,1-dichloroethene ("1,1-DCE"); methelyne chloride; trichlorofluoromethane (Freon 11); and 1,4-dioxane.

40.     While the investigations detected some compounds above quality standards in the groundwater near the monitoring wells associated with the 1992 methylene chloride release, the highest concentrations of the vast majority of the VOCs site-wide were detected in MW-15S, which is located upgradient (e.g., at a higher slope) from the 1992 release and directly under the plant building, and MW-13S, which is located along the apex of the groundwater flow direction from the plant.  Given the high concentrations of PCE, methylene chloride, and Freon 11 detected in MW-15S, it is very possible that other compounds may have been present in that

monitoring well, but were masked due to the elevated concentrations of the three named compounds.

41.    In addition, 1,4-dioxane was detected only in monitoring wells associated with the former floor drain system release.  The compound was not detected above quality standards in any of the monitoring wells associated with the 1992 release.

42.    Moreover, the investigations led to the discovery of an apparent crushed empty drum near MW-13S (which is located at a distance from the plant building and AST building). The investigations also revealed that PCE and TCE groundwater concentrations in MW-13S are greater than two wells located in an upgradient direction.  These facts suggest that an additional source area may be near MW-13S, which is not a result of the known plume migration from the 1992 release or the floor drain system release.

43.    With respect to the soil at the Site, investigations show the presence of compounds above acceptable concentrations, particularly PCE, PCE daughter products, and methylene chloride.  The affected soil is limited to the areas adjacent to the AST building, the area between the main plant building and the on-site pond, and under the northwest end of the plant building.

44.    The location of high concentrations of VOCs other than methylene chloride within the soil column near the 1992 release, and the location of high concentrations of VOCs in the soil column under the plant building evidences that the presence of these compounds did not result solely from the 1992 methylene chloride release.

45.    With respect to the soil vapor and sub-slab vapor at the Site, investigations show the presence of, *inter alia*, the following compounds above acceptable concentrations: PCE, TCE, VC, and Freon 11.  The affected soil vapor was located adjacent to the AST building.  The

affected sub-slab vapor was located adjacent to the AST building and under the plant building (which is upgradient from the location of the 1992 release).

46.     In addition to the compounds noted, the investigation of the sub-slab vapor under the plant building revealed the presence of a previously unidentified compound: 1,1,2-trichlorotrifluoroethane ("CFC 113").

**FXI's Insurance Claim with Illinois Union**

47.     FXI reported the subject "pollution conditions" to Illinois Union in May 2013.

48.     As previously noted, up until March 2013, the investigation activities and remediation efforts undertaken pursuant to the Administrative Agreement were focused in the area of the 1992 methylene chloride release.  After discovery of the former floor drain system inside the plant; the presence of VOCs in MW-11, which is at a distance from the location of the 1992 release; and the detection of 1,4 dioxane, a different compound than those associated with the 1992 release, FXI's REC determined that the "pollution conditions" at issue resulted from a separate plume unrelated to any prior, known "pollution conditions."  FXI then notified Illinois Union of the present claim.

49.     In the summer of 2014, Illinois Union denied coverage to FXI.  The primary basis for Illinois Union's denial is that the "pollution conditions" identified in the recent investigations at the Site are the same conditions identified in the "Known Conditions" endorsements.

50.     In its most recent disclaimer, Illinois Union cites to six purported prior known pollution conditions at the Site: "(1) two methylene chloride spills in 1992 that caused soil contamination, (2) VOC and SVOC contamination in groundwater in excess of regulatory action levels, (3) high concentrations of PCE, TCE, methylene chloride and Freon 11 in the shallow groundwater aquifer at the 'apparent source area,' so identified because of the high COC

[constituents of concern] concentrations in MWs 5, 6 and 7, (4) concentrations of PCE and methylene chloride exceeding standards in the deep groundwater aquifer at MWs 5 and 7, (5) various contaminants dumped and buried in trenches adjacent to the former baseball diamond with soil and groundwater contamination in this area, and (6) the facility was formerly equipped with a floor drain into which production area wash down was disposed."

51.    No release affiliated with the floor drain system was ever identified as a "pollution condition" in any documents listed in the Schedules of Known Conditions.

52.    The discharges and dispersals at issue in this action are not the same discharges and dispersals as the previously identified "pollution conditions" cited by Illinois Union.

53.    The fact that many of the same chemicals were involved in the new "pollution conditions" does not mean the new "pollution conditions" are part of the previously known and identified "pollution conditions."  There is nothing in the Policy that says that merely having the same chemicals involved is sufficient to make all dispersals and discharges related and part of previously identified "pollution conditions."

54.    In addition, neither of the methylene chloride spills are the source of the "pollution conditions" for which FXI seeks coverage.

55.    At least one source area of the "pollution conditions" at issue is the release associated with the former floor drain system in the plant.  This determination is supported by, *inter alia*, the following facts: (i) the vast majority of the VOCs in the groundwater site-wide were detected in monitoring wells located either: (a) upgradient (*e.g.*, at a higher slope) from the 1992 release and directly under the plant, where the former drain system was located, or (b) along the apex of the groundwater flow direction from the plant, so they cannot have resulted from the same discharges and dispersals as the prior Known Conditions caused by the 1992

release; (ii) a separate compound, 1,4-dioxane, was detected above quality standards only in groundwater monitoring wells associated with the former floor drain system release; (iii) high concentrations of VOCs other than methylene chloride within the soil column near the 1992 release and high concentrations of VOCs within the soil column under the plant building suggests that the contamination did not result solely from the 1992 release; and (iv) the investigation of the sub-slab vapor under the plant building revealed the presence of a previously unidentified compound, CFC 113, which was not detected in the vicinity of the 1992 release.

56.     In addition, there may exist an additional source area nearby MW-13S, as suggested by the discovery of an apparent crushed empty drum near that well and the fact that groundwater concentrations of PCE and TCE in MW-13S are greater than two wells located in an upgradient direction.

57.     The detection of VOCs in the groundwater in the monitoring wells located near the 1992 release does not contradict these facts or alter the conclusion that one or more additional discharges of pollutants occurred.

58.     Any dumping and burying of contaminants in trenches adjacent to a baseball field by the former owner of the Site would have occurred on property separate from and topographically downgradient of the Site, and thus is not the source of the "pollution conditions" at issue. A June 9, 2003 environmental site assessment opined that, based on its location and the topographic gradient, the adjacent property represented a low to moderate environmental risk to the Site.

59.     In sum, the subject "pollution conditions" are previously unknown "pollution conditions," and are covered under Coverage A of the Policy.

60.     Illinois Union further based its denial of coverage on the exclusion in Endorsement 15, claiming that "all of the 'pollution conditions' related to historic discharges to the floor drain commenced, in whole or in part, before October 1990."

61.     Endorsement 15 operates as an exclusion to coverage, for which Illinois Union bears the burden of proof.

62.     Illinois Union has offered no factual support for this position, other than a mere conclusory statement that "[t]he floor drains were in operation from 1965 and the groundwater plumes and contaminant migration velocities demonstrate that the initial groundwater impacts started then." This is insufficient to meet Illinois Union's burden of proof.

63.     Therefore, Endorsement 15 does not apply to bar coverage.

64.     Finally, in the same denial letter, Illinois Union acknowledges that the detection of CFC 113 in the sub-slab vapor under the plant building and the PCE/TCE contamination in MW-13S may constitute covered "pollution conditions." Despite this acknowledgement, and despite the fact that remediation costs relating to the claim have exceeded the self-insured retention, Illinois Union has not paid for costs relating to remediation of these conditions.

## COUNT I: BREACH OF CONTRACT

65.     Paragraphs 1-64 are incorporated by reference.

66.     The Policy is a contract between FXI and Illinois Union.

67.     All conditions and requirements imposed by the Policy upon FXI, including the payment of premium and notice of claims, have been satisfied, waived, or are the subject of an estoppel or other avoidance against Illinois Union.

68.    Illinois Union owes a contractual duty to pay for "claims" and associated "legal defense expenses" covered by the Policy, which includes the remediation costs incurred to date in compliance with the Administrative Agreement.

69.    Illinois Union has breached the express terms of the Policy by denying FXI's insurance claim and refusing to pay costs covered under the Policy.

70.    As a direct and proximate result of this breach, FXI has been denied the benefits of insurance coverage for which Illinois Union collected substantial premiums, and has incurred greater than $330,000 in excess of the Policy's retained amount, and will incur up to approximately $1,416,000 more to remediate the covered "pollution conditions."

## COUNT II: DECLARATORY JUDGMENT

71.    Paragraphs 1-70 are incorporated by reference.

72.    Pursuant to the Policy, Illinois Union has a duty to pay for "claims" and associated "legal defense expenses" covered by the Policy, which includes future remediation costs to comply with the Administrative Agreement.

73.    Illinois Union disputes that it is obligated to pay for these costs.

74.    An actual and justiciable controversy exists between the parties concerning the parties' rights and obligations under the Policy.

75.    All parties necessary to provide full relief have been joined in this action and no other parties are necessary.

76.    This controversy is ripe and of sufficient immediacy to justify the issuance of a declaratory judgment because FXI has suffered, and will continue to suffer, financial injury as a result of Illinois Union's wrongful coverage position, and continued failure to provide coverage.

77.    FXI lacks an adequate remedy at law.

78.    A judicial declaration is necessary and appropriate under the circumstances alleged above, so that FXI may ascertain its rights to payments under the Policy.

**REQUEST FOR RELIEF**

79.    **WHEREFORE,** FXI is entitled to (i) an award against Illinois Union for all amounts already incurred and to be incurred by FXI in remediating the Site in an amount of at least $1.4 million or as otherwise established by evidence; (ii) a declaration pursuant to 28 U.S.C. § 2201 by this Court that Illinois Union is legally obligated under the Policy to pay for future remediation costs relating to the "pollution conditions" at issue up to the Policy's limits of liability; (iii) pre-judgment interest from the date on which Illinois Union should have made such payments; (iv) post-judgment interest; (v) all attorneys' fees and costs incurred by FXI in connection with this matter; (vi) all other consequential damages allowed by law; and (vii) such additional relief as this Court deems just and appropriate..

Dated: April 14, 2015          Respectfully submitted,
New York, New York

Jean M. Farrell (#JF0485)
599 Lexington Avenue
22nd Floor
New York, NY 10022
T: (212) 521-5400
F: (212) 521-5450
jfarrell@reedsmith.com

Jay M. Levin  (#JL8934)
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103
T: (215) 851-8100
F: (215) 851-1420
jmlevin@reedsmith.com

*Attorneys for Plaintiff FXI, Inc.*